OKLAHOMA LAND CO. *et al.* v. THOMAS *et al.*

No. 1882.    Opinion Filed August 20, 1912.

Rehearing Denied October 8, 1912.

(127 Pac. 8.)

1.  **INDIANS — Domestic Affairs — Intercourse Between Sexes—Customs and Usages.**  Prior to the dissolution of the tribal government of the Creek Nation, the United States government expressly recognized the right of the Creek Indians to regulate their own domestic affairs, and to control the intercourse between the sexes by their own customs and usages.

2.  **MARRIAGE — Indian Customs — Validity—Children—Legitimization.**  Marriages by Freedmen citizens of the Creek Nation residing therein, contracted according to the usages and customs of the tribe of which they became members, during the period that the tribal relations existed, and were recognized by the United States government, will be considered valid in the courts of this state, and the children of such marriage will be regarded as legitimate.

3.  **SAME—Plural Marriages.**  Plural marriages, if ever authorized by the customs and usages of the Creeks, were thereafter expressly prohibited and forbidden by the act of the Creek Council, passed October 22, 1881.

4.  **SAME—Federal Statutes—Application.**  Neither the act of Congress of July 1, 1862 (chapter 126, 12 St. at L. 501), the amendatory act of March 22, 1882 (chapter 47, 22 St. at L. 30 [U. S. Comp. St. 1901, p. 3633]), or the act of March 3, 1887 (chapter 397, 24 St. at L. 635 [U. S. Comp. St. 1901, p. 3635]), in relation to polygamy and unlawful cohabitation, was ever in force in the Creek Nation in the Indian Territory, among the members of said tribe, who intermarried according to the tribal usages and customs, and while the tribal relations were maintained and recognized by the United States government.

5.  **INDIANS—Property—Descent—Creek Indians.**  Section 1 of article 2 of chapter 12 of the Laws of the Muskogee (Creek) Nation, and section 258 of chapter 14 of the Laws of said Nation, as compiled and codified by A. P. McKellop, under act of October 15, 1892, confer upon an illegitimate child the right to share in the estate of the putative father who had recognized such child as his own, and did not give to the brothers and sisters of the half blood of such legitimated child the right to share in its estate with a sister of the whole blood; the father having died prior to the death of such child.

6.  **SAME—Inheritance From Father.**  Said acts of the Creek Council do not render such child capable of inheriting as the legal repre-

sentative of such father, but only legitimatizes it as respects the father.

7.    **INDIANS—Usages and Customs—Evidence.** Testimony tending to prove the laws, usages, and customs of the Creek Nation, with regard to the marriage relation and the legitimacy of the children of such marriages, and their consequent legal status as heirs, during the period in question, held, competent, and that it was error to exclude such testimony, if otherwise competent.

(Syllabus by Sharp, C.)

*Error from District Court, Wagoner County;*
*John H. King, Judge.*

Action by John R. Thomas and Grant Foreman against the Oklahoma Land Company and Pig Walker to recover possession of certain land and for damages for rents and profits arising therefrom. Judgment for plaintiffs, and defendants bring error. Reversed and remanded.

*N. A. Gibson* and *H. C. Thurman,* for plaintiffs in error.

*Horace Speed, Robert F. Blair,* and *Charles G. Watts,* for defendants in error.

Opinion by SHARP, C. This action involves the title to the surplus allotment of Lucretia Scott, a freedman citizen of the Creek Nation. The plaintiffs below, hereinafter referred to as plaintiffs, claim title by deeds of conveyance as follows: Warranty deed to 80 acres of said land from Ellen Johnson, since deceased, and Robert Johnson, her husband, the said Ellen Johnson, formerly Ellen Scott, being the alleged heir at law of her deceased sister, Lucretia Scott; and by last will and testament, duly probated, of said Ellen Johnson, deceased, who devised her remaining interest in the estate of her deceased sister to her husband, Robert Johnson, who by subsequent deed, after the due probation of said last will and testament, conveyed to the plaintiffs the remaining interest in said 122 acres of land. The plaintiffs in error, hereinafter referred to as defendants, claim title to said lands by warranty deeds executed by Walter Scott, Sammie Scott, Tom Scott, Letha Guess (*nee* Scott), Tackie Scott, Butcher Scott, and Peter Scott, whom they allege were the broth-

ers and sisters of Lucretia Scott, and from whom they inherited the lands in controversy.

Plaintiffs, however, claim that Lucretia Scott and Ellen Johnson were the illegitimate daughters of Malissa Gregory, *nee* Bruner, deceased, who was in her lifetime a duly enrolled freedman citizen of the Creek Nation. While the answer of the defendants put in issue the question whether Ellen Johnson obtained any rights in the estate of Lucretia Scott, it is admitted in this court that said Ellen Johnson succeeded to a one-seventh interest in the said estate, and claimed that the other six-sevenths passed to the grantors of defendant Oklahoma Land Company. These grantors, save Peter, were the children of Nellie Scott, *nee* Grayson, and Dixon Scott. Nellie and Dixon were married at the Old Agency by Rev. John Kernal, December 24, 1877, in accordance, as claimed by plaintiffs, with the customs and laws of the Creek Nation. There is direct evidence tending to show that Dixon and Nellie lived together as husband and wife until his death in March, either in 1891 or 1892. Ellen and Lucretia (or "Tekie" Scott) were the children of Malissa Bruner. Ellen was born January 10, 1888, and was about eighteen months older than Lucretia. These children took the names of their reputed father, Dixon Scott. On the part of plaintiffs it was contended that Ellen and Lucreia were the bastard children of Malissa Bruner, while the defendants contended that, under the customs and usages of the Muskogee or Creek Nation, Malissa, the mother of said children, was a lawful wife of Dixon Scott, and that Lucretia having died unmarried, without issue, and having left surviving her no father or mother, her estate would descend to the brothers and sisters of the half-blood equally with those of the whole blood in the same degree. It was further contended on the part of the defendants that, independent of the question of the marriage of Malissa to Dixon, the latter having during his lifetime recognized Ellen and Lucretia as his offspring, said children, even though illegitimate at their birth, were by such recognition for all purposes legitimated, and their status became the same as if born in lawful wedlock.

We have, therefore, the two questions to consider: (1) Was Malissa, according to the customs and usages of the Muskogee (Creek)· Nation, a lawful wife of Dixon; (2) the legal ·effect that would follow the reputed father's parental recognition. The first of these questions involves various considerations.

Defendants contend: That, at the time of the accrual of the rights of their grantors, the status of the parties, their property rights, and all civil rights and duties, were governed and controlled by the usages, customs, and laws of the Muskogee (Creek) Nation of Indians, and that the first written law on the subject of marriage was passed by the Creek National Council, and approved October 22, 1881. The provisions of this statute here applicable are as follows:

"Section 308. From and after the passage of this act, all marriages between citizens, who are now living together as man and wife, are hereby legalized.

"Sec. 309. No new marriage shall be contracted whilst either party has a husband or wife living, nor between parties who are nearer of kin than the third degree."

—That prior to the passage of said act, according to the usages and customs of the Creek people, marriage could be consummated either with or without any formal ceremony, and that when a man and woman commenced cohabiting together they were deemed man and wife, and that at the time it was customary for a man to cohabit with two or more women, all of whom were considered as his wives, and that the children of such marriages were considered the legitimate offspring of the father to all intents and purposes, as if there had been but one wife. The first section mentioned legalized former marriages between citizens at the time living together as man and wife, while the latter section prohibits the contracting of new marriages while either party has a living husband or wife. Other provisions of chapter 23, of which the sections set out form a part, authorize the dissolution of the marriage ties by divorce proceedings in the tribal district courts, so that the latter section, being construed in connection with that which follows, was doubtless intended to apply only to cases· where the husband or wife, as the case might be, had a living undivorced husband or wife. It is urged by plain-

tiffs in error that this act was a recognition on the part of the National Council that there existed a custom among the Creek people that permitted plural or polygamous marriages. The question is one of importance. The baneful influence of polygamy upon society, and upon the home, as an existing institution, is not involved. If such was the custom among the Creek people, it is now obsolete except in so far as it may have to do with the devolution of titles in what is hoped may be a limited number of cases. The relationship, whatever it was, that existed between Dixon and Malissa, was one that was governed by the usages, customs, and laws of the Creek people.

In article 2 of the treaty between the United States and the Muskogee Nation, concluded June 14, 1866 (14 St. at L. 785), it was provided:

"And inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter these persons lawfully residing in said Creek country under their laws and usages, or who have been thus residing in said country, and may return within one year from the ratification of this treaty, and their descendants and such others of the same race as may be permitted by the laws of the said nation to settle within the limits of the jurisdiction of the Creek Nation as citizens (thereof), shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds, and the laws of the said nation shall be equally binding upon and give equal protection to all such persons, and all others, of whatsoever race or color, who may be adopted as citizens or members of said tribe."

This provision of the treaty was recognized and became effective by section 2, art. 1, c. 7, of the laws of the Muskogee Nation, published in 1880. To this class of citizens both Dixon, Malissa, and Ellen belonged. By article 10 of the foregoing treaty the Creeks agreed to such legislation as Congress and the President of the United States might deem necessary for the better administration of justice and the protection of the rights of persons and property within the Indian Territory; provided, however, that such legislation should not in any manner interfere with or annul their present tribal organization, rights, laws, privileges, and customs. This tribal relation of the Creek Indians,

during the entire time in question, was maintained and recognized by the United States as a distinct political community, and it was only by subsequent legislation that the tribal government of the Creeks ceased to exercise its functions of local self-government. There was not, during the period involved, any law or treaty of the United States on the subject of Indian marriages, or any attempted regulation that in any way interfered with the Indian usages and customs on the subject; but, on the other hand, these people were governed by their own laws and customs by solemn treaty compact. The Muskogee or Creek Nation of Indians was one of the Five Civilized Tribes of Indians owning and occupying a portion of the eastern part of what was then an unorganized territory known as Indian Territory. They had a written Constitution. There were three departments of government; the legislative, executive, and judicial. The lawmaking power of the Nation was lodged in the Council, consisting of two houses: The House of Kings, and the House of Warriors. The executive power was vested in a Principal Chief, and in case of his death, resignation, or removal from office, in a Second Chief. Judicial authority was conferred upon a High Court and various District Courts, and other officers. Legislative and executive officers were elected by popular vote, while the judicial officers were chosen by the National Council.

The laws governing these people were those of their own enactment, or those customs generally observed which had ripened into and had the effect of a written law. When such custom is shown to have existed, it must control. The question is one not wanting in precedent, but is abundantly supported by authority. In *Jones v. Meehan et al.*, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, it is said in the syllabus:

"The right of inheritance in lands of a member of an Indian tribe whose tribal organization is still recognized by the government is controlled by the laws, usages, and customs of the tribe, and not by the law of the state in which the land is situated, nor by any action of the Secretary of the Interior."

Moose Dung was a Chippewa Indian Chief and had a plurality of wives, and his tribe had laws of descent and distribution which were unwritten, similar to the old English primogeniture-

ship; the lands descending to the oldest son of the first wife on the death of the father. It was said by the court that:

"Upon the evidence contained in this record, it is quite clear that by the laws, usages, and customs of the Chippewa Indians, old Moose Dung's eldest son and successor as chief inherited the land of his father, to the exclusion of other descendants."

This court, in *Cyr v. Walker*, 29 Okla. 281, 116 Pac. 931, 35 L. R. A. (N. S.) 795, in recognizing the binding force and effect to be given to Indian marriages, said:

"The courts of the American Union have, from an early time, recognized the validity of marriages contracted between the members of any Indian tribe in accordance with the laws and customs of such tribe, where the tribal relations and government existed at the time of the marriage, and there was no federal statute rendering the tribal customs or laws invalid."

In *Brown et al. v. Steele et al.*, 23 Kan. 672, in an opinion by Brewer, J., it was said:

"Though the tribe may have dwindled in numbers, though its chief domicile may have been changed, though, for many purposes, it may have been merged into some other tribe, yet, so long as the government recognizes its tribal existence and a tribal control of persons and property, such recognition is conclusive upon the courts."

It was held that the parties in interest being Shawnee Indians, and their tribal organization being recognized by the political department of the United States government, the descent was cast, not under the Kansas law, but in accordance with the Shawnee law.

In *Kalyton v. Kalyton*, 45 Ore. 116, 74 Pac. 491, 78 Pac. 332, the testimony showed that the plaintiff's mother had lived with, as the wife of, three Indians, named Ish-lo-wal-ko, White Wolf, and Top-la-won. The testimony showed that plaintiff's mother had married these persons in the Indian manner, and that she ceased to live with and separated from each according to the custom of her tribe, and that Top-la-won afterwards remarried. No testimony was offered tending to show how an Indian divorce was secured, but the court held the testimony was sufficient to show that she was divorced from them and was capable of entering into a valid marriage relation with Kalyton.

In *Earl v. Godley*, 42 Minn. 361, 44 N. W. 254, 7 L. R. A. 125, 18 Am. St. Rep. 517, it was said that an Indian tribe within the state, recognized as such by the United States government, is to be considered as a separate community or people, capable of managing its own affairs, including the domestic relations, and those persons belonging to the tribe, who are recognized by the custom and laws of the tribe as married persons, must be so treated by the courts, and the children of such marriages cannot be regarded as illegitimate.

In *First Nat. Bank of Austin v. Sharpe*, 12 Tex. Civ. App. 223, 33 S. W. 676, in an action where the issue was whether plaintiff's father and mother were married at the time of her birth, it appeared that the mother was an Indian, residing in the Creek Nation in the Indian Territory; that the parents, without having any ceremony performed, agreed to become husband and wife; that they cohabited for a considerable time before and after plaintiff was born, and publicly treated each other as husband and wife; that according to the customs and usages of the Creeks, at and prior to 1848, the facts recited constituted a valid marriage, and it was so held.

Other cases in point are: *Henry et al. v. Taylor*, 16 S. D. 424, 93 N. W. 641; *Fisher v. Allen*, 2 How. (Miss.) 611; *Morgan v. McGhee*, 5 Humph. (Tenn.) 13; *Wall v. Williamson*, 8 Ala. 48; *Wall v. Williams*, 11 Ala. 826; *Johnson v. Johnson's Adm'r*, 30 Mo. 72, 77 Am. Dec. 598; *La Riviere v. La Riviere*, 77 Mo. 512; *Boyer v. Dively et al.*, 58 Mo. 510; *United States v. Shanks*, 15 Minn. 369 (Gil. 302); *People ex rel. La Forte v. Rubin* (Sup.) 98 N. Y. Supp. 787; *Jones v. Laney et al.*, 2 Tex. 342; *In re Heirs of House*, 132 Wis. 212, 112 N. W. 27; *Kansas Indians*, 5 Wall. 737, 18 L. Ed. 667; *Pourier et al. v. McKinzie et al.* (C. C.) 147 Fed. 287.

Will this rule, however, be enforced, where the rights in controversy arise out of a plural or polygamous Indian marriage, where recognized as lawful according to the prevailing usages and customs of the Indian tribe? The question of plural marriages was involved in *Jones v. Meehan, supra;* but the validity of such marriages was not expressly determined, though the tribal

custom of passing title to the eldest son of the first wife was recognized.

In *Kobogum v. Jackson Iron Co.*, 76 Mich. 498, 43 N. W. 602, Marji Gesick, a Chippewa Indian, died leaving children by two wives. All were Chippewa Indians, living in the Indian tribal relations, and the marriages were before the cession of the lands by treaty. The testimony showed that the wives were considered lawful wives and the children lawful children, by the Indian usages, and so recognized by Marji Gesick. It was said:

"The testimony now in this case shows what, as matter of history, we are probably bound to know judicially, that among these Indians polygamous marriages have always been recognized as valid, and have never been confounded with such promiscuous or informal temporary intercourse as is not reckoned as marriage."

It was further said:

"We have here marriages had between members of an Indian tribe in tribal relations, and unquestionably good by the Indian rules. The parties were not subject in those relations to the laws of Michigan, and there was no other law interfering with the full jurisdiction of the tribe over personal relations. We cannot interfere with the validity of such marriages without subjecting them to the rules of law which never bound them."

In *Ortley v. Ross*, 78 Neb. 339, 110 N. W. 982, it was said:

"Now, it is contended by appellant that, as the alleged marriage between the father and mother of the plaintiff was polygamous, it was neither valid in the state of Minnesota, where the parties then resided, nor in the state of Nebraska, to which they subsequently removed. This contention would be well founded if this marriage had taken place between the citizens of the United States in any state of the Union. But a different rule prevails with reference to the marriages of Indians, who are members of a tribe recognized and treated with as such by the United States government; for it has always been the policy of the general government to permit the Indian tribes as such to regulate their own domestic affairs, and to control the intercourse between the sexes by their own customs and usages. Consequently, when a member of an Indian tribe becomes a citizen of the United States and subject to its laws, by taking lands in severalty under the provisions of a treaty, as in the case at bar, a liberal rule is applied in determining the legitimacy of any offspring that he may have begotten under the customs and usages of the tribe to which

he formerly belonged. The rule so applied is that marriages valid by the law governing both parties when made must be treated as valid everywhere." ′ .

That Congress at all the times in question recognized the rights of the Creek Indians to regulate their domestic affairs indisputably appears from the act of May 2, 1890 (26 St. at L. c. 182, p. 81), in section 38, which among other things provides:

"That all marriages heretofore contracted under the laws or tribal customs of any Indian nation now located in the Indian Territory are hereby declared valid, and the issue of such marriages shall be deemed legitimate and entitled to all inheritances of property or other rights, the same as in the case of the issue of other forms of lawful marriage: Provided further, that said chapter one hundred and three of said laws of Arkansas shall not be construed so as to interfere with the operation of the laws governing marriage enacted by any of the civilized tribes, nor to confer any authority upon any officer of said court to unite a citizen of the United States in marriage with a member of any of the civilized nations until the preliminaries to such marriage shall have first been arranged according to the laws of the nation of which said Indian person is a member."

It is said by counsel that this statute refers to "forms of lawful marriage," and that by reason of section 5352, U. S. Rev. St., which became a law July 1, 1862, together with the amendment of March 22, 1882 (22 St. at L. 31), prohibiting bigamy in the territories and providing for its punishment, the marriage of Dixon Scott to Malissa, being bigamous, was not by the act of May 2, 1890, made valid. Neither the act of July 1, 1862, nor the amendment of March 22, 1882, nor the act of March 3, 1887, had reference to marriages in the Creek Nation, between its members, according to the tribal customs, for the very good reason that the federal government had recognized the rights of the Creeks to control their own local affairs without interference or supervision on its part. The original act was one prohibiting bigamy in the territories, and whose citizens were amenable to the laws of the United States in force therein. The later acts were directed against polygamy as practiced by the Mormon Church in Utah, and other territories of the United States. It was held in *United States v. Crawford,* 6 Mackey, 319, that the purpose of Congress in passing these laws was to abolish polyg-

amy in the territories, not to provide for the punishment of big-amy or cognate misdemeanors in the District of Columbia.

We have no difficulty in reaching the conclusion that these various acts of Congress have no application whatever to this case, and that at no time concerned did Congress attempt by leg-islation or executive order to interfere with the Creek citizens in the exercise of their domestic affairs. But, while Congress by the act of May 2, 1890, validated all marriages theretofore contracted under the laws or tribal customs of any Indian na-tion then located in the Indian Territory, and declared that the issue of such marriages should be deemed legitimate and entitled to all inheritances of property or other rights, the same as if the issue of other forms of lawful marriage, it did not attempt to, nor did the act have the effect of, legitimating the issue born of an adulterous relation. There must have first existed a valid marriage under the laws or tribal customs of the tribe. Because a male citizen may lawfully have two or more wives, it does not follow that all females with whom he may have maintained a meretricious relation were his wives.

There was testimony tending to show that Dixon Scott bore toward Malissa the relation of a husband. There was also testi-mony which tended strongly to show that the relationship was an adulterous one, and from which no rights of inheritance in the progeny could attach. The fact that Dixon was excluded from the church of which he was a member on account of his alleged adulterous relations with Malissa tended to support this view. Two propositions are therefore presented: (1) What was the law or custom of the Creek Nation at the time in question? (2) If this law or custom permitted plural marriages, then was Dixon married to Malissa according to such custom, and prior to October 22, 1881? There being proof offered that tended to establish these two necessary facts, it was error for the trial court to ex-clude such testimony and direct a verdict for the plaintiffs.

The remaining question, that of the paternal recognition of Lucretia and Ellen by Dixon Scott, their reputed father, leads to the question: Did the court err in excluding section 1 of article 2 of chapter 12 of the Constitution and Laws of the Mus-

kogee Nation, published by authority of the National Council in 1880, and section 258 of chapter 14 of the Constitution and Laws of the Muskogee Nation, as compiled and codified by A. P. Mc-Kellop under act of October 15, 1892? The first-mentioned section provides:

"Should any person or persons appear, claiming to be the child or children of any deceased male citizen of this Nation, should it be proved that such deceased citizen did not during life recognize such person or persons as offspring, then such persons shall not be entitled to any share in the estate of the deceased"

—and was in force at the time of the death of Dixon Scott in March, 1891, or 1892. This statute, as carried forward in Mc-Kellop's Compilation of 1892, in so far as the present case is concerned, remained unchanged; both statutes by their express terms confining the right of inheritance thus conferred to the estate of the deceased alone.

There was testimony introduced showing that Dixon Scott in his lifetime had recognized Ellen and Lucretia as his offspring. The effect, however, of this recognition does not appear to legitimatize such offspring generally, and to confer upon them all the legal rights of legitimate children; but, on the other hand, the obvious purpose of the statute was to enable bastard children, recognized by the father as his offspring, to share in his estate upon his demise, thus limiting the effect of such legitimation to lineals, and that as to collaterals the taint of bastardy should still inhere.

The Creek Council, in the exercise of its lawful function of local self-government, saw fit to limit the legal rights of an illegitimate child to that of sharing in the estate of his putative father, and not to confer upon such child generally the status of a child born in lawful wedlock. This question is ably and fully discussed in *Hicks' Adm'r v. Smith et al.*, 94 Ga. 809, 22 S. E. 153. There the Code of 1882, sec. 1787, prescribing the manner in which persons born illegitimate should be made legitimate, contained the clause: "And capable of inheriting from his father." It was held that, in a proceeding under said section of the Code, the judgment therein authorized did not have the effect of ren-

dering legitimate a bastard child according to the full significance of that term, but only the effect to render him legitimate in so far as to enable him to inherit from his father.

In *Safford, Guardian, v. Houghton's Estate,* 48 Vt. 236, in an opinion by Ross, J., it was said:

"This language is to be construed according to its natural import, unless such construction would give to it a result manifestly not intended, or fail to accomplish a result clearly intended, by the Legislature. *Bacon v. McBride,* 32 Vt. 585. The language is guarded, and limited to defining the relations which shall exist between the father and child as the result of such adoption—'the child shall thereafter be considered as respects the father, legitimate, and the same rights * * * shall exist between such father and child as if the child were born in lawful wedlock.' This language, obviously, does not attempt to carry the results of the adoption beyond the immediate parties thereto, but rather circumscribes and limits the effect of the act to such father and child. Such, we think, is the construction to be given to the language of the statute. Hence, by the act of adoption, George F. Houghton rendered his theretofore illegitimate son, legitimate as respects him, and nothing more. To Abel Houghton, the father, and to all other kindred of George F., Frederick remained, as before the adoption—an Ishmael, *filius nulius*—baseborn, with no heritage quality in his blood. While he could inherit directly from his father, he was incapable of representing his father in the estate of Abel Houghton—in law, the son of George F. Houghton, but not the grandson of Abel Houghton."

In *Lee et al. v. Shankle et al.,* 51 N. C. 313, it was insisted on behalf of the petitioners that the private act of the Legislature legitimatizing George Pickney Coppedge, the illegitimate son of John Lee, not only made said legitimatized son the heir and next of kin to his father, John Lee, but also to, Winney Lee, the legitimate daughter of said John Lee; but it was said that the act declaring to whom he should be rendered legitimate and made an heir by strong implication excluded him from being a lawful heir to, or taking property either real or personal from, any other person, and the court so held.

The Scott children, the fruit of the marriage of Dixon and Ellen, and through whom plaintiff in error Oklahoma Land Company deraigned its title, being, according to the claims of plain-

tiffs in error, the half brothers and sisters of Lucretia, the deceased allottee, are her collateral kindred, and could not share in her estate unless the said Lucretia was the legitimate child of their father, Dixon, by a second marriage. The effect of the acts of the Muskogee Council, last above quoted, only gave to Lucretia and her sister Ellen the right to share in the estate of their father, Dixon; but as he died prior to their deaths, and as the estate in controversy is that of Lucretia, no claim arising under these statutes is presented.

The testimony that Dixon recognized Ellen and Lucretia as his children was competent as a circumstance tending to show the relation that may have existed between the mother and reputed father, but was incompetent to establish a legitimation of said children whereby they could inherit of the estate of other than the putative father.

The other errors assigned are such as need not occur at a second trial, and are not considered.

The judgment should be reversed, and the case remanded for a new trial.

By the Court: It is so ordered.