## CHANCEY v. WHINNERY.

No. 5928.    Opinion Filed March 2, 1915.

Rehearing Denied April 27, 1915.

(147 Pac. 1036.)

1. **INDIANS—Marriage—Indian Marriages——Validity—Right to Inherit.** Marriages between citizens of the Creek Nation residing therein, contracted according to the usages and customs of the tribe of which they were members during the time that the tribal relations existed, where recognized by the general government, will be deemed valid in the courts of this state, and the issue of such marriages regarded legitimate and entitled to all inheritances of property or other rights the same as in the case of the issue of other forms of lawful marriage.

2. **MARRIAGE—Indian Marriages—Validity—Recognition by Federal Government.** Prior to the dissolution of the tribal government of the Creek Nation, the United States government expressly recognized the right of the Creek Indians to regulate their own domestic affairs, and to control the intercourse between the sexes by their own customs and usages.

3.   **MARRIAGE—Second Marriage—Presumption of Validity—Divorce.** A second marriage being shown as a fact, a strong presumption is raised in favor of its legality, which is not overcome by mere proof of a prior marriage, and that the husband had not obtained a divorce before the second marriage. The party attacking such second marriage has the burden of proof to show that neither party to the first marriage had obtained a divorce.

4.   **SAME.** The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it that such requirement is enforced, even though it involve the proving of a negative.

5.   **SAME.—Indian Marriages.** The rule announced in the second preceding paragraph is not affected by the fact that the parties to the respective marriages are Indians, and that the marriages under review were entered into according to the customs and usages of the tribal authorities.

(Syllabus by the Court.)

*Error from District Court, Okmulgee County;*
*Wade S. Stanfield, Judge.*

Action by H. L. Chancey against William J. Whinnery. Judgment for defendant, and plaintiff brings error. Affirmed.

*Eaton & Cowley,* for plaintiff in error.

*William M. Matthews,* for defendant in error.

SHARP, J.   This case presents error from the district court of Okmulgee county, and involves the title to the allotment of Pompey West, a deceased full-blood Creek Indian, who died intestate on April 17, 1911. At the time of his death said Pompey West left surviving him no wife, no children, no issue of any children, no mother, no brother or sister. On April 24, 1911, Mary Barnett, maternal grandmother of said Pompey West, made and executed to the plaintiff, Chancey, a warranty deed to Pompey's allotment, which deed was duly approved by the county judge of Okmulgee county. On September 19, 1911, Billy West, the putative father of Pompey, executed a deed to said allotment to the defendant, which deed was also approved by the county court. On the part of plain-

tiff in error it is insisted that Billy West and Sissie Barnett (daughter of Mary Barnett), the mother of Pompey West, were never legally married under the laws or tribal customs of the Creeks, for the reason that, at the time Billy and Sissie assumed their relations by living together, Billy had a living, undivorced wife named Sardeeka, and that hence the relations existing between Billy and Sissie were adulterous, and not matrimonial, and that, even though Pompey was the son of Billy, he was an illegitimate from whom Billy could not inherit at his death. Plaintiff in his amended reply pleads and here relies upon sections 308, 309, 311, 312, 313, 314, 315, of the Creek statute on marriage and divorce, approved October 22, 1881. Constitution and Laws of the Muskogee Nation, Compiled and Codified by A. P. McKellop, under Act October 15, 1892, pp. 108, 109; Constitution and Laws of the Muskogee Nation, as compiled by L. C. Perryman, March 1, 1890, pp. 108, 109.

By the undisputed evidence it was established that Billy West and Sardeeka had, for a number of years prior to the passage of the above-named act, sustained toward each other the relation of husband and wife, according to the customs and usages of the Creek people. It was further proven that this relationship continued until during the year after the close of the Spieche or Green Peach Rebellion, which, according to the evidence, occurred during the years 1882 and 1883. Billy testified that during the latter year he and Sardeeka separated and abandoned their marriage relations on account of Sardeeka's transgressions; that some years thereafter he met Sissie while the two were employed by Jackson Barnett, and that they then agreed to live together; that he first consulted Jim Barnett (presumably Sissie's father), and obtained his consent to their marriage. Billy and Sissie continued to live and co-habit together until the latter's death, which occurred in about the year 1891. While there is some dispute as

to the true relationship sustained by these parties toward each other, there is abundant evidence that they recognized and treated each other as husband and wife, and that they were generally reputed to be such among their relatives and acquaintances, and those with whom they came in contact. This we held in *Fender, Adm'r. et al. v. Segro et al.,* 41 Okla. 318, 137 Pac. 103, to be sufficient to give rise to a presumption that the parties had previously entered into an actual marriage. Such was the conclusion reached by the trial court, who found that Pompey West left surviving him, as his sole and only heir at law, his father, Billy West; and "the court finds that Pompey West was the legitimate child of Billy West and Sissie Barnett, who were lawfully married according to Creek custom prior to 1890, and that they lived together as husband and wife up until the death of Sissie Barnett."

The position of counsel for plaintiff in error is, as we understand, that Billy and Sardeeka not having been divorced as provided by the statutes of the Creek Nation, the former was incompetent to enter into the marriage relation with Sissie. The validity of Indian marriages contracted between members of any Indian tribe, in accordance with the laws and customs of such tribe, where the tribal relations and government existed at the time of the marriage, is one generally, if not universally, recognized, and is the settled law of this jurisdiction. *Cyr v. Walker,* 29 Okla. 281, 116 Pac. 931, 35 L. R. A. (N. S.) 795; *Oklahoma Land Co. et al. v. Thomas et al.,* 34 Okla. 681, 120 Pac. 8; *Buck v. Branson,* 34 Okla. 807, 127 Pac. 436, 50 L. R. A. (N. S.) 876.

Billy and Sardeeka having, therefore, been lawfully married according to the tribal customs, and having lived together as husband and wife, subsequent to the passage of the Creek statute regulating divorce, it is insisted that, there being no proof of a legal divorce, it can only follow that the relationship between Billy and Sissie was meretri-

cious, and that Pompey was not, therefore, the legitimate son of Billy. But what proof is there that Billy and Sardeeka were never divorced? The statement by Billy that he had never applied for a divorce from Sardeeka in the district court of the Creek Nation is no evidence that Sardeeka had not obtained a legal divorce from Billy. Marriage will not be destroyed on presumption. The law is astute to preserve the sanctity of the marriage relation, the legitimacy of children, and stability of descent and distribution, and therefore presumes innocence and virtue in the absence of proof of the contrary. *Coachman v. Sims et al.*, 36 Okla. 536, 129 Pac. 845; *Clarkson et al. v. Washington*, 38 Okla. 4, 131 Pac. 935.

In *Haile v. Hale*, 40 Okla. 101, 135 Pac. 1143, the plaintiff testified that she had never obtained a divorce from her first husband, but did not testify as to whether he obtained a divorce from her and that by such divorce their marriage relations were dissolved. There the defendant introduced depositions of the clerks of the circuit courts of three counties in Illinois and one county in Texas, in which counties the plaintiff's former husband had at different times resided. It was said by the court that the evidence did not establish that the counties named in the depositions were the only counties in which said former husband resided during said time and that said courts were the only courts that had jurisdiction to grant him a divorce. It was further said that the stability of descent and distribution, the rendering illegitimate of innocent children upon such facts as were presented by the record in that case, established the wisdom of the presumption that sustains the validity of a marriage contracted under the forms of the law; and it was held that the trial court did not err in his finding to the effect that the presumption had not been overcome. The syllabus in part reads:

"Where a marriage has been consummated in accordance with the form of the law, the law indulges a strong presumption in favor of its validity. One who asserts the invalidity of such a marriage because one of the parties thereto has been formerly married, and the spouse of such former marriage is still living, has upon him the burden of proving that the first marriage has not been dissolved by divorce or lawful separation."

In Bishop on Marriage, Divorce, and Separation, it is said:

"It being for the highest good of the parties, of the children, and of the community that all intercourse between sexes in form matrimonial should be such in fact, the law, when administered by enlightened judges, seizes upon all probabilities and presses into its service all things else which can help it, in each particular case, to sustain the marriage, and repel the conclusion of unlawful commerce." (Sections 77, 956, 958.)

The authorities, with very general accord, are to the effect that, when a marriage in fact has been shown, the law raises a presumption that it is valid, casting the burden on him who questions it to establish its invalidity. This is one of the strongest presumptions known to the law. Among the many authorities sustaining the rule announced in *Haile v. Hale, supra,* see *Coal Run Coal Co. v. Jones,* 127 Ill. 379, 8 N. E. 865, 20 N. E. 89; *Potter v. Clapp,* 203 Ill. 592, 68 N. E. 81, 96 Am. St. Rep. 322; *Scott's Adm'r. et al. v. Scott,* 77 S. W. 1122, 25 Ky. Law Rep. 1356; *Pittinger v. Pittinger,* 28 Colo. 308, 64 Pac. 195, 89 Am. St. Rep. 193, note; *Nixon v. Wichita Land & Cattle Co.,* 84 Tex. 408, 19 S. W. 560; *Smith v. Fuller,* 138 Iowa, 91, 115 N. W. 912, 16 L. R. A. (N. S.) 98, note; *Alabama & V. R. Co. v. Beardsley,* 79 Miss. 417, 30 South. 660, 89 Am. St. Rep. 660; *Sparks v. Ross et al.,* 79 N. J. Eq. 99, 80 Atl. 932; *Erwin, Adm'r. v. English,* 61 Conn. 502, 23 Atl. 753; *In re Rash's Estate,* 21 Mont. 170, 53 Pac. 312, 69 Am. St. Rep. 649.

Measured by the rule laid down, plaintiff failed in his proof. Every intendment of law is in favor of matrimony. The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it, that such requirement is enforced, even though it involve the proving of a negative. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void. *Nixon et al. v. Wichita Land & Cattle Co.*, 84 Tex. 408, 19 S. W. 560. The salutary rule so widely recognized and enforced should *a fortiori* find lodgment in the courts of this state, where the parties to the marriage relations are all full-blood Indians, unused and unaccustomed to the laws of the whites, and to whom written laws governing their domestic relations were innovations at the time.

The presumption of marriage and the legitimacy of children is in no wise affected by the fact that the parties were citizens of the Creek Nation, and that the marriages under review were entered into according to the customs and usages of the tribe.

May 2, 1890, Congress enacted (26 Stat. at L. c. 182, p. 81, sec. 38) :

"That all marriages heretofore contracted under the laws or tribal customs of any Indian nation now located in the Indian Territory are hereby declared valid, and the issue of such marriages shall be deemed legitimate and entitled to all inheritances of property or other rights, the same as in the case of the issue of other forms of lawful marriage."

By this it was the purpose of Congress to give full force and effect to Indian marriages contracted according

either to the laws or customs of the Indian tribes in the Indian Territory, and to make legitimate the issue of such marriages, so that such **issue would have the full** right of inheritance of property, or other rights. At the time of the passage of the foregoing act, Billy and Sissie were living and cohabiting together as husband and wife, according to the tribal customs, and continued so to do, as we have already seen, until the death of the latter. While the act had naught to do with the legitimacy in fact of the child of Billy and Sissie, it is expressive of the intention of Congress to give full recognition to the validity of Indian marriages, and the legitimacy of the issue thereof, where the marriages were contracted according to the laws or tribal customs. The act does not attempt to make valid adulterous relations sustained toward each other by tribal members. It simply declares that valid which, according to the tribal laws and customs, was valid.

The judgment of the trial court is affirmed.

All the Justices concur.