# BUTLER *et al.* v. WILSON.

No. 4228. Opinion Filed December 21, 1915.

(153 Pac. 823.)

1.  **WITNESSES—Competency—Objection.** Objection to the witness on the ground of competency must go to the competency of the witness, and is insufficient if the objection merely goes to the competency of the testimony of the witness.

2.  **MARRIAGE — Indians — "Regular Marriages" — "Irregular Marriages."** Subsequent to the passage of act of 1891 (sections 308, 309, 310, Constitution and Laws of the Muskogee Nation of 1893 by A. P. McKellop) regulating marriages among members of the Creek Tribe or Nation of Indians and until January 1, 1898 (as provided by the act of Congress approved June 7, 1897 [30 Stat. 83, c. 3]), marriages among members of the Creek Tribe or Nation were regular and irregular. Where the marriage relation was entered into in accordance with the letter of the written law, such marriage was regular. Where the marriage relation was entered into in accordance with the tribal usages and customs without compliance with the modes prescribed by the written statute, such marriage was irregular. Irregular marriages according to the usages and customs of the Creek Tribe or Nation, being recoginzed as valid by the members of the tribe or nation during said period, will be recognized as valid in the courts of this state.

3.  **SAME—Common-Law Marriage—Validity.** Subsequent to the 1st day of January, 1898, the laws of Arkansas, as contained in chapter 103 of Mansfield's Digest, regulating marriages, together with the common law, was in effect in the Creek Nation and applicable to the members of the Tribe. Marriages among members of the Tribe after said date in accordance with the common law are valid.

4.  **SAME — Validity of Irregular Marriage — Evidence.** Where the validity of an irregular marriage is the issue, testimony of the general reputation of a woman, or acts far removed in point of time tending to establish that she was a prostitute, are inadmissible.

5.  **INDIANS—Inheritance—Proof of Parentage—Sufficiency.** Under section 258 of the Constitution and Laws of the Muskogee Nation, 1893, by A. P. McKellop, providing: "If any person claim to be the child of a deceased male person, and it should be proven that such person did not, during life, recognize the claimant as his

offspring, then such claimant shall not. be entitled to any share in the estate of the deceased," it is incumbent on the claimant to show that he was recognized by a male member of the Creek Tribe during his life as his offspring before the claimant is entitled to inherit from said deceased male member of the tribe.

(Syllabus by McKeown, C.)

*Error from District Court, McIntosh County;*
*Preslie B. Cole, Judge.*

Action by Jim Butler, an infant, by his guardian, and another, against Martha Wilson. Judgment for defendant, and plaintiffs bring error. Reversed and remanded.

*Herbert E. Smith,* for plaintiffs in error.

*J. B. Lucas* and *B. H. Tabor,* for defendant in error.

Opinion by McKEOWN, C. This case presents error from the district court of McIntosh county, and involves the determination of the heirs of Sam Butler, a deceased Creek Indian, who died intestate, prior to the selection of his allotment. There is no controversy between the parties as to the time of the descent cast, or as to the law governing the same. To correctly decide who are the heirs of Sam Butler, deceased, it is necessary to determine whether Sam Butler was ever married to Jennie King, *nee* Tiger, according to the laws, customs, and usages of the Creek Tribe or Nation of Indians. Also, whether Jim Butler, one of the plaintiffs in error, is the son of Sam Butler, deceased, and if not the legitimate offspring of Sam Butler, whether he was recognized by the deceased as his child.

The plaintiffs in error, Jennie King and Jim Butler, base their right to inherit the lands of the deceased upon the claim of a marriage some time during the years 1892

to 1895, between Sam, Butler and Jennie King, according
to the laws, usages, and customs of the Creek Tribe or
Nation of Indians, urging that by reason of said marriage
Jennie King is the surviving wife and Jim Butler is
the surviving child.   Jim Butler also claims to inherit
upon the further ground that if the marriage between his
mother and Sam Butler be not established, then, under
the laws of the Creek Nation, he being an illegitimate
child of Sam Butler, but acknowledged by him in his
lifetime, he is entitled to the property of his putative
father, and in support of his claim he pleads section 258,
c. 14, Constitution and Laws of the Creek Nation, Com-
piled by A. P. McKellop.

The defendant in error, Martha Wilson, is a sister
of the deceased, and is entitled to inherit the lands in
controversy, unless the plaintiffs in error establish their
claim thereto.   The defendant in error denies the mar-
riage between Sam Butler and Jennie King, and pleads
the statute and rule of decision of the highest court of
the Creek Nation governing marriages and divorces, and
alleges that any relations that may have existed between
the deceased and Jennie King were not in conformity
with the laws and rule of decision of the Creek Nation,
and further denies that Jim Butler was the child of
Sam Butler or so recognized.

The testimony discloses that Jennie King lived with
four different men of her tribe, and bore a child to each
of them prior to the commencement of her relations with
Sam Butler, that one of the men with whom she lived
was Jackson King, her present husband, who at the time
he first lived with her had a living wife.   After her rela-
tions with Sam Butler ceased she married Jackson King

by a formal ceremony. It appears that some time between 1893 and 1895 Sam Butler lived with Jennie King, *nee* Tiger, at the home of her father, Tobe Tiger; that shortly after they separated the child, Jim Butler, was born. He was enrolled under the name of Jim Butler and his father's name given as Sam Butler.

It is urged by the defendant in error that Jennie King was an incompetent witness to testify. The objection was not made to the competency of the witness, and therefore does not raise the question here for determination. *Williams et al. v. Jones et al.*, 34 Okla. 733, 126 Pac. 1013. It does not seem to us that it is clear upon what theory the plaintiff Jennie King seeks to recover in this action, if she was married to her present husband prior to the death of Sam Butler, as testified to in the trial below.

The trial court excluded testimony offered on behalf of the plaintiffs to establish the marriage between Jennie King and Sam Butler according to the usage and custom of the Creek Nation, on the ground that the court took judicial notice of the written law and decisions of the court of the Creek Nation. Prior to the written statute made in 1891 by the Creek Council regulating marriage and divorce the usage and customs of the Creek people govern in regard to both marriage and divorce. The Creeks, like all primitive people, deemed their domestic associations as matters personal to the families or individuals concerned, and the subjects never became of importance to the nation until the passage of the act of 1891, which is in words as follows:

"Sec. 308. From and after the passage of this act, all marriages between citizens, who are now living together as man and wife, are hereby legalized.

"Sec. 309. No new marriage shall be contracted whilst either party has a husband or wife living, nor between parties who are nearer of kin than the third degree.

"Sec. 310. Marriages may be solemnized by any of the judges of the courts of this nation, or by any ordained minister of the Gospel in regular communion with any religious society; and any marriage, contracted in writing, or in the presence of two or more witnesses who shall sign the marriage contract as such, shall be lawful."

(Constitution and Laws of the Muskogee Nation of 1893 by A. P. McKellop.)

Subsequent to the passage of said act there does not appear from the record before us any construction of the written laws in question until the year 1893, when, on November 3d, the Supreme Court of the Creek Nation, through Esparhecher, acting as Chief Justice, rendered an opinion construing a portion of the written law in regard to marriages, in reply to a letter from the Principal Chief (which defendant offered to introduce in evidence but was excluded by the trial judge) which opinion is in words as follows:

"SUPREME COURT ROOM, OKMULGEE, I. T., Nov. 3rd, 1893.

"Hon. L. C. Perryman, Prin. Chief—Sir: Yours at hand—submitting to the court and requesting the court's opinion and the decision on law which reads, 'And any marriage contracted in writing, or in the presence of two witnesses who shall sign the marriage contract as such shall be lawful.' The court after careful and due consideration is of the opinion and decree that no marriage is legal unless the contract is in writing and signed by two or more witnesses, and no marriage contract should be solemnized, by any authorized minister or officer, un-

less such contract is reduced to writing and properly signed. It is so declared.

"(Court adjourned to meet at 1 p. m.)

"1 p. m.   Court met at 1 p. m. and proceed with business.   The court, after hearing a short speech from the Chief Just. *pro tem.* Esparhecher, court adjourn to meet in June term, 1894.

"Judges present:   Esparhecher, Chief Just. *pro tem.* Wm. Jones, Chaplain.   Wm. McCombs.   Ned Robbins.
"J. H. LAND, *Clk. of Court.*"

After the passage of the Creek law in 1891 regulating the marriage of members of the tribe it is apparent that the full-blood members were slow to grasp the innovation caused by the nation concerning itself in matters wholly personal to the family as they believed, and there being no provision in the statute making marriages in any other mode than that set out in the statute void, it follows as a logical sequence that marriages between members of the tribe according to the usages and customs of the tribe were considered valid by the tribe.   The opinion of the Supreme Court, which should have been admitted in the trial, shows on its face not to be a decision in a case where the court had jurisdiction of a particular cause or persons, but it is in the nature of an opinion construing the statute for the guidance of the executive department in the discharge of its functions.

While the Creek Tribe of Indians has been judicially determined to be a distinct political society in the case of *Crabtree v. Madden,* 54 Fed. 426, 4 C. C. A. 408, where Sanborn, Circuit Judge, speaking for the court, says:

"The Creek Tribe of Indians is a dependent domestic nation.   It is a distinct political society, capable of man-

aging its own affairs and governing itself. As such a nation the United States has maintained treaty relations with it for more than a century. * * * These treaties and this legislation demonstrate that this tribe has carefully preserved its separate political identity, and that it is still managing its own affairs, and exercising, through officers of its own selection, legislative, executive, and judicial functions within its territorial jurisdiction" —and a judgment of the highest court of the Creek Nation construing a statute of that nation while acting within its jurisdiction should stand on the same footing as those of other courts of the territories of the Union (*Mehlin et al v. Ice,* 56 Fed. 12, 5 C. C. A. 403); yet it is equally well settled that the court of the state trying the cause may determine whether the judgment proven was rendered by a court having jurisdiction. We are of the opinion that said decision of the Supreme Court of the Creek Nation was merely advisory to the Principal Chief, and does not make invalid the marriages of the Creek Indians according to their ancient usages and customs subsequent to the passage of the act or rendition of the decision. Judging from the facts disclosed in the evidence offered by the plaintiffs, marriages in the Creek Nation after the passage of the written law enacted in 1891 were either regular or irregular—regular when they complied with the literal letter of the law, and irregular when a man and woman lived together according to the usage of the tribe as husband and wife without any compliance with the mode or ceremony prescribed by law.

A similar custom as to marriages was in vogue in Scotland less than a century ago. Marriages under the Scottish law were regular when celebrated by a minister of religion, after proclamation or banns or notice given

by registrar. Marriages were considered irregular, but regarded as legal, either when the marriage state was entered into by a simple agreement, or when a man and woman by habit and repute cohabited for a length of time and were generally considered as husband and wife. This recognition of irregular marriages in Scotland made Gretna Green, near Solway Firth, famous as the meeting place of fugitive lovers from England, who, being unable to obtain parental consent, hied themselves to Gretna Green and entered into an irregular marriage under the Scottish law by the simple process of jumping a broom in the presence of the blacksmith. This practice was not abated until after the act of 1856 requiring one of the parties to the marriage to reside in Scotland for 21 days prior thereto. We decline to require of the Creek people a more rigid standard than that which governed our own ancestors.

We therefore conclude that such irregular marriages among the Creeks were valid until the passage of the act of Congress of date June 7, 1897 (30 Stat. 83), providing that after the 1st day of January, 1898:

"The laws of the United States and the State of Arkansas in force in the Indian Territory shall apply to all persons therein irrespective of race."

Which act was applicable to the Creek Nation, and thereafter it would appear that the laws of the State of Arkansas relative to marriage were in force and the common law on the subject applied alike to the Creeks and to non-citizens. It necessarily follows that marriage among the Creek people after January 1, 1898, was required to be in the mode prescribed by Mansfield's Digest, or by entering into a common law marriage.

The learned trial judge fell into error in refusing the plaintiffs the right to introduce testimony showing a marriage by custom and usage of the Creek Tribe.

"Testimony tending to prove the laws, usages, and customs of the Creek Nation, with regard to the marriage relation and the legitimacy of the children of such marriages, and their consequent legal status as heirs, during the period in question, held competent, and that it is error to exclude such testimony, if otherwise competent." (*Oklahoma Land Co. v. Thomas et al.*, 34 Okla. 681, 127 Pac. 8.)

The validity of such marriage under the laws, usages, and customs of the Creek Nation has been determined by this court since the trial of this case below. *Oklahoma Land Co. v. Thomas et al.*, 34 Okla. 681, 127 Pac. 8; *Chancey v. Whinnery*, 47 Okla. 272, 147 Pac. 1036.

The court erred in refusing to admit in evidence the laws of the Creek Nation when offered by the defendant. It is so well settled that the laws of a foreign nation, a sister state, or territory must be pleaded and proven that it requires no citation of authority. The defendant had pleaded the law and was entitled to prove same; however, the defendant, having won below, makes no complaint here.

It is a question of fact to be established in each particular case as to whether a valid marriage, according to the Tribal laws or usages and customs, existed between members of the Creek Nation up to January 1, 1898. The plaintiffs in error urge as error the admission by the court, over their objections, of evidence as to the relations of Jennie King with other men, for a considerable period of time, prior to the time she is alleged to have lived with

Sam Butler, and also testimony as to her general reputation. Testimony tending to show that Jennie King was a prostitute during the period of her relations with Sam Butler, and immediately prior, and subsequent thereto, was admissible as affecting the probative force of the evidence of their living and cohabitating together.

The testimony as to her general reputation was clearly inadmissible, and likewise the testimony was inadmissible as to her relations with other men prior to the living with Sam Butler, which relations were so far removed by time as to be of no value in determining the nature of the relation with Sam Butler. To permit such inquiry to go so far, would be to close the door of hope to every unfortunate woman, who has at some remote period in her life fallen, but later returned to chaste living by entering into the marriage relation. Because, forsooth, if the validity of the marriage be questioned in a court of justice, she must confront her forgotten past and assume a burden not imposed by law. *Warren v. Canard,* 30 Okla. 514, 120 Pac. 599.

As to the claim of Jim Butler under section 258 of the Constitution and Laws of the Creek Nation Compiled by A. H. McKellop, which reads:

"If any person claims to be the child of a deceased male person, and it should be proven that such person did not, during life, recognize the claimant as his offspring, then such claimant shall not be entitled to any share in the estate of the deceased."

We find that this section was construed by this court in *Oklahoma Land Co. et al., v. Thomas et al., supra,* in respect to the extent of the inheritance of the child from the putative father. Under this provision it is necessary

for an illegitimate child, in order to establish its right to inherit from a male member of the Creek Nation, to prove that the putative father recognized the child as his offspring. Recognition of the child by a male member as his offspring was sufficient in our opinion to give the child the right to inherit, no matter how illicit or meretricious the relations were out of which he sprung.

Plaintiffs in error urge upon this court the necessity of rendering the judgment that it may think proper upon the record brought here, but inasmuch as it is largely a question of fact as to whether a valid marriage under the laws, usages, and customs of the tribe existed, or whether Jim Butler was recognized by Sam Butler, we do not feel warranted in rendering a judgment in this case upon the record before us. Believing that the errors complained of were prejudicial to the substantial rights of plaintiffs in error, we therefore recommend that the judgment of the district court be reversed, and the cause remanded for a new trial in accordance with this opinion.

By the Court: It is so ordered.