## JOHNSON et al. v. DUNLAP et al.

No. 5318—Opinion Filed Feb 12, 1918.

Rehearing Denied June 11, 1918.

(173 Pac. 359.)

(Syllabus.)

**1. Indians — Tribal Marriages — Recognition by Federal Government.**

Prior to the dissolution of the tribal government of the Choctaw Nation the federal government expressly recognized the right of the Choctaw Indians to regulate their own domestic affairs, and control the intercourse between the sexes by their own tribal usages and customs.

**2. Marriage—Indian Marriages—Validity.**

Marriages between citizens of the Choctaw Nation residing therein contracted according to the usages and customs of the tribe of which they were members, and while the tribal relations existed and were recognized by the federal government, will be sustained and held valid in the courts of this state, "and the issue of such marriages shall be deemed legitimate and entitled to all inheritances of property, or other rights, the same as in the case of the issue of other forms of lawful marriage."

**3. Marriage—Evidence.**

Evidence examined, and held to fairly support the findings of the trial court.

**4. Indians — Allotment — Devolution—Law Applicable.**

The allotment of a deceased member of the Choctaw Nation who died in 1904 intestate and without issue, whose mother and father were each Choctaw citizens by blood, is controlled in its devolution by the applicable provisions of Mansfield's Digest of the Laws of Arkansas in force in the Indian Territory by act of Congress. Where the allotment came through the blood of both tribal parents, it ascends equally to the father and mother. If either be dead, then the interest that would otherwise have passed to such deceased parent passes to his or her heirs.

**5. Same.**

Nor is there anything in section 35 of the act of Congress approved July 1, 1902 (32 Stat. p. 641, c. 1362), which affects the foregoing rule of descent, where the mother died prior to the closing of the tribal rolls on September 25, 1902, leaving a child capable of inheriting.

Error from District Court, Bryan County; Summers Hardy, Judge.

Action by Simon Johnson and others against H. M. Dunlap and others. From the judgment, both plaintiffs and defendants prosecute error to this court. Affirmed.

Hayes & Caudill (Holley & Pyle, of counsel), for plaintiffs in error.

Charles B. Cochran, Charles E. McPherren, Geo. S. Ramsey, Malcolm E. Rosser, and Edgar A. De Meules, for defendants in error.

SHARP, C. J. This case presents error from the district court of Bryan county, and involves the title to the allotment of Sissie Billy, a deceased full-blood Choctaw Indian. On the part of plaintiffs in error, Johnson and others, it was claimed that Sissie Billy, the allottee, was the legitimate offspring of a tribal marriage between Simon Johnson and Louisa Dwight. Johnson was also known by the name of Simon Dwight and Simon Achakanli Fel a Chi, while Louisa Dwight bore the Indian name of Tarchy. The defendants in error claimed that the relationship existing between Simon and Tarchy was meretricious and not matrimonial in its nature, and that Sissie was the illegitimate progeny of the adulterous relations. To this claim the plaintiffs in error replied in kind by making the charge that Charles King, through whom the remaining defendants deraign their title, was the bastard child of Tarchy and one Davis King, the result of an adulterous cohabitation between said Tarchy and Davis King after the former had broken off her relations with Simon.

According to the findings of fact of the trial court Simon and Tarchy had lived and cohabited together as husband and wife for a number of years, during which time, and the result of such cohabitation, Sissie was born; that though no ceremonial marriage was performed, yet they had assumed towards each other the relation of husband and wife, and were recognized as such by those who knew them at the time; also that at the time there existed among the Choctaw people a tribal custom whereby "parties who desired to assume the relation of husband and wife went together and stood up in the presence of their relations as a token of their intention to assume the marriage status, and their kinsfolk would give them presents." Also that a custom existed among these people that whenever one or the other became dissatisfied on account of their marital relation, all that was necessary to do to sever it was "to leave the other"; and that such abandonment, in effect, constituted a divorce between the parties. Notwithstanding the charge urged with apparent seriousness that the findings of the court are unsupported by the evidence, we are of the opinion, after careful reading of the record, that the court's finding of fact is abundantly supported; indeed, it would seem that the preponderance of the evidence establishes the view arrived at by the trial court. In such circumstances we have no disposition, nor, indeed, have we the right, to disturb the findings of the trial court.

The question of the validity of Indian tribal marriages is well settled in this jurisdiction. The legality of such marriages contracted between members of any Indian tribe, in accordance with the laws and customs of such tribe, where the tribal relations and government existed at the time of the marriage, is one generally, if not universally, recognized. The subject is one frequently recurring in this state, because of its early settlement and the devolution of its titles that followed the allotment of the Indian lands of the state. Cyr v. Walker et al., 29 Okla. 281, 116 Pac. 931, 35 L. R. A. (N. S.) 795; Okla. Land Co. v. Thomas, 34 Okla. 681 127 Pac. 8; Buck v. Branson et al., 34 Okla. 807, 127 Pac. 436, 50 L. R. A. (N. S.) 876; Chancey v. Whinnery, 47 Okla. 272, 147 Pac. 1036; Butler v. Wilson, 54 Okla. 229, 153 Pac. 823; James et al. v. Adams, 56 Okla. 450, 155 Pac. 1121. In addition to the foregoing opinions and others of this court, the act of Congress of May 2, 1890 (26 Stat. at L. c. 182, p. 81), in section 38 thereof, expressly provided that all marriages theretofore contracted under the laws or tribal customs of any Indian

Nation now located in the Indian Territory were thereby declared valid, and the issue of such marriages to be deemed legitimate and entitled to all inheritances of property or other rights, the same as in the case of the issue of other forms of lawful marriage. The evidence clearly brought the case within the rule announced by this court in Fender, Adm'r, et al. v. Segro, 41 Okla. 318, 137 Pac. 103, and Chancey v. Whinnery, supra.

The relation that was assumed between Simon and Tarchy commenced shortly after the end of the Civil War. The white man's civilization had at the time not reached the full-blood Choctaw settlements in the Indian Territory to any appreciable extent. These people lived their simple lives, and it appears both assumed and cast off the marital relation unhampered by either form or ceremony. While Simon and Tarchy did not live together for but five or six years, and during that time acquired no fixed abode or habitat, it does appear from the uncontradicted evidence that Simon was a loving husband, and we think did fairly well under all the circumstances. True it is that he had numerous wives, including Amy, Lucy, Selima and Jency, but the evidence reasonably supports the view that, unlike some of the patriarchs of old, he carefully avoided entangling domestic alliances, though prompt at all times to take on and cast off the marital relation, without eclat or ostentation. While Simon's testimony and that of Holly James, Ticey James, Jency Folsom, and Mathew Henry is flatly contradicted by that of Rev. Willis Tobley, a full-blood Choctaw preacher, we are inclined to believe, as did the trial court that Simon and his witnesses, among whom were his kinsmen, knew more of his domestic affairs than did brother Tobley, who, it seems, was a strong believer for his day in ceremonial marriages.

The judgment of the trial court found that at the death of Sissie her estate ascended one-half to her father, Simon, and one-half to her half-brother, Charles. On the part of plaintiffs in error, it is claimed that the decree in their favor should have been for the entire interest, because, as they say, Tarchy, the mother of Sissie, was not on the approved rolls prepared by the Commission to the Five Civilized Tribes, having died prior to September 25, 1902. Assuming that Tarchy died prior to the closing of the rolls, it does not follow that Charles, her child, the half-brother of Sissie, could not take as an heir at law of his deceased half-sister. The contention that the provisions of chapter 49 of Mansfield's Digest of the Laws of Arkansas in force by congressional enactment in the Indian Territory, when considered in connection with section 35 of an act of Congress to ratify and confirm an agreement with the Choctaw and Chickasaw Tribes of Indians, approved July 1, 1902 (32 Stat. at L. p. 641, c. 1362), limits the right of inheritance to tribal citizens living on September 25, 1902, notwithstanding the fact that such deceased citizen left heirs capable of inheritance, is wholly untenable. The purpose of the statute was not to preclude the right of inheritance, but to fix a time for the closing of the rolls that the allotting authorities might be enabled to determine the units into which the tribal property should be divided. Tarchy, if living, would have inherited equally with Simon in the inheritance of the estate of their deceased daughter, Sissie. When Sissie died the interest in her estate which would otherwise have been inherited by her mother passed to the latter's son, Charles. Such was the holding in Buck v. Simpson, 65 Okla. 265, 166 Pac. 146, following Thorn v. Cone, 47, Okla. 781, 150 Pac. 701. In that case the allottees, Lena Jefferson and Sissie Jefferson, were the children of Nellie Jefferson, a Seminole woman and a member of the Seminole Tribe who died prior to the enrollment of the Seminole citizens, under the act of Congress providing for the approval of the Seminole rolls. Thomas Jefferson was the father of Lena and Sissie, and a member of the Seminole Tribe. Both father and mother were Indians by blood. There was also born to the mother Nellie a son by the name of Sam Harjo, who was a duly enrolled citizen of the Seminole Nation. Sissie died in February, 1903. Lena in July, 1904. In the opinion it was held that as the allottees died intestate and without descendants, their allotments ascended equally to the father and his heirs and the mother and her heirs. The case is squarely in point, indeed the facts are the same, save the tribal enrollment. There is nothing in the Seminole Treaty which distinguishes it in this respect from the Choctaw-Chickasaw Treaty, under which Sissie Billy selected her allotment. The rule of descent is the same in both cases.

Accordingly, we conclude, as did the trial court, that on the death of Sissie, her estate ascended one-half to her father, Simon Johnson, and one-half to her brother, Charles King.

The judgment of the trial court is therefore affirmed.

All the Justices concur