[342] ROBERT M. JONES vs. LANEY ET AL., by their next friend, JAMES COLBERT — Appeal from Lamar County.

The right of those Indian nations, residing within the limits of a state, to regulate their own civil polity has never been questioned, unless the state authority has, by some affirmative act, claimed a jurisdiction incompatible with such right. Their laws and customs regulating property, contracts, and the relations between husband and wife, have been respected when drawn into controversy in the courts of the state and of the United States.

The statutes of a state cannot be judicially known to the courts of another state, and they must be proven as other foreign laws. The courts can only judicially know the acts of congress and public treaties.

Where the plaintiffs, who were negroes, sued to establish the fact of their freedom, and gave in evidence thereof a deed of manumission in their favor, executed by their master whilst a citizen of the Chickasaw nation of Indians, and who, together with such negroes, then resided therein; and the judge charged the jury, "That in the absence of proof of any law, custom or usage of the Chickasaws forbidding the emancipation of a slave, if the deed presented was fully proven and they believed it to be good, genuine and authentic, the plaintiffs were entitled to their freedom: " Held, that such charge was correct.

Where the relation of master and slave is proven to have existed and the latter was freed by the former, the presumption is that such act was rightfully done, on the general principle that the right of property connects with it the right of relinquishing that property. This presumption can only be rebutted by proof of some municipal regulation applicable in restraint of such right, the onus of proving which must devolve on the party denying the right. [17 Tex. 20.]

Where a witness swore to a fact as happening in 1821 or 1822, and other testimony was introduced showing that the fact did not happen until after 1823, it was not error in the court to charge the jury that it did not destroy the credibility of the witness as to other facts — the witness being only presumed to swear as to the time according to his best recollection and belief.

The material facts of this case will be found stated in the opinion of the court.

*Harris* and *Martin*, for appellant, contended —

1st. That if the paper purporting to be a deed of manu-mission was genuine, still it was inoperative, because the [343] same was made in violation of the laws of Georgia, which were then in full force in that portion of the Chickasaw nation where Gunn resided. They cited, in support of this position, the treaty of cession from Georgia to the United States made in 1805.

2d. That if the laws of Georgia did not prevail those of Mississippi did, and should have been the rule of decision; that they, also, were violated in the act of manumission.

3d. That if neither the laws of Georgia or Mississippi controlled, but the laws, usages and customs of the Chickasaw Indians did, then the jury found without evidence, as there was no testimony before them showing that there was a law, usage or custom of the Chickasaw nation governing or in any wise applicable to the case before the court. The plaintiffs, having alleged that such laws, usages, etc., governed the question at issue, should have been required to prove the same. 2 Pet. Dig. 21, secs. 50, 57, 58; 4 Cond. 395; 4 Wheat. 77.

*Morrill* and *Evarts*, *contra*, in support of the fact, as charged by the judge, that the Chickasaws were recognized as a separate and distinct nation, cited U. S. Treaties at Large, 7 vol. p. 24; Worcester v. Georgia, 6 Pet. 515.

As to the second part of the charge relating to the manumission of slaves, they cited McCutchen v. Marshall, 8 Pet. 220.

As to the allegations that Gunn held his property subject to the laws, usages and customs of the Chickasaws, they cited Tutten v. Martin, 3 Yerg. 452.

Mr. Justice Lipscomb delivered the opinion of the court.

The facts of this case, so far as they are deemed material to be stated, as presented by the record are, that Laney and the other petitioners, who are all the offspring of the said [344] Laney, are negroes, and they filed by their next friend their petition in the court below, praying that they may be adjudged free. The petition sets out that Laney was born a

slave, the property of one James Gunn, in 1811, in the old Chickasaw nation, now in the state of Mississippi. That Gunn was an Indian and married to an Indian woman, and lived in the nation. That in 1814 Gunn, her master, manumitted her by a writing under his seal, recorded in the Chickasaw agency. That at the time of the said manumission she, Laney, being very young, continued to live with her mother, who was the slave of the said James Gunn, in the family, until the death of her former master in 1823, but not as a slave, nor had she during that time been treated as a slave. That she then went to reside with one Susan Colbert, also a Chickasaw woman residing in the Chickasaw nation, in whose family the said Laney and the other petitioners, who are her children and grandchildren, continued to reside up to the month of November, 1846. The record shows that Jones, the appellant, claims to hold the petitioners as his slaves by purchase made of Rhoda Potts and Joseph B. Potts, her husband claiming to be, together with Molly Gunn, the heirs at law of the said James Gunn. That Rhoda Potts is the daughter of James Gunn, and Molly Gunn is his widow and the mother of Rhoda. That Rhoda Gunn claims as the residuary legatee, under the will of her father, James Gunn. The evidence shows that the claimants all lived in the Chickasaw nation, in the immediate neighborhood, not more than one and a half miles from Susan Colbert, in whose family the petitioners resided. The will of James Gunn, after making specific devises of two or three slaves by name, devises the balance of his slaves without designating them by name to his daughter Rhoda, and the name of the petitioner, Laney, is not mentioned in the will. That the petitioners emigrated with the family of Susan Colbert in 1842 to the Choctaw nation, and continued to live with her as free persons until November, 1846. It is [**345**] shown that the appellant, Jones, is of Indian descent and lived in the Choctaw nation. The writing under which the appellees claim their freedom is as follows, *i. e.:* " Chickasaw Agency, 28th of January, 1814. To all who shall see these presents, Greeting: "Be it known to all persons, that I, James Gunn, of the Chickasaw nation, being in my proper senses, and owing no

individual person any just debt, have thought proper, of my own free will and accord, to enfranchise a mulatto female child named Laney, two years and nine months old, which girl was borne and raised my own property, no other person having any claim to the said girl but myself. I hereby give to Laney her freedom from this date. She is no longer a slave. Given under my hand and seal, the day and date above written.

"Present,                      JAMES GUNN.   [Seal.]"
    *Thomas McCoy,*
    *James Robertson.*

U. S. C. A.   "Indorsed," recorded in the Chickasaw agent's office, January 13, 1844.

A. M. UPSHAW, C. A.

The death of both McCoy and Robertson was proved, and their handwriting, and that the latter was Chickasaw agent, and the former clerk to the agency at the time the instrument bears date, and that the body of the instrument was written in the handwriting of McCoy. The handwriting of Gunn was proven. It was in proof, by two witnesses who had known Laney from her earliest infancy, that she had always been called and considered free from the time of her emancipation by her former master; and, by one of them, that when she was very young, her master said that from the friendship he had for her father, she should never be a slave to any one. And by one of them, " that he had heard James Gunn say that he had set her free and had given her a freedom paper, and that he had recorded that [**346**] in the agency office in the now state of Mississippi." The same witness testified that Gunn died and was buried in 1821 or 1822.

The evidence of the appellant to establish the state of slavery of the appellees was the testimony of Molly Gunn, the widow of James Gunn and the mother of Rhoda Potts, under whom the appellant claimed title by purchase. She swears that Laney was born the slave of her husband, James Gunn; that the mother of Laney belonged to him; that she had never heard of her emancipation or claim of freedom until a very short time since; that she had never heard of the paper purporting to be a letter of emancipation until not long since;

that Laney lived with James Gunn until his death; that some time after she went to live with Susan Colbert, two or three years after the death of James Gunn; until that time she had labored as a slave; that Laney had two children after the death of James Gunn before she went to live with Susan Colbert. Witness did not make a demand of her, but her daughter Rhoda told Laney to go home; but she replied that her husband would not permit her. She said the Colberts were strong and she was weak, and that was the reason she did not assert her rights; that the strongest party held possession in the nation; she thought that it was probably about three years from the date of the will that her husband died. It was in proof that the will of James Gunn bore date in 1823.

The judge charged the jury "that by the treaty entered into by the United States and the Chickasaws in ——, the same were recognized to be a separate and distinct nation of people. That their laws and customs and usages, within the limits defined to them, governed all property belonging to any one domesticated and living with them, and that in the opinion of the court neither the laws of Georgia, Mississippi, state or territory, nor those of Texas, can be the rule of decision in this case. The court also charged that by the principles of the civil law, under which slavery such as [347] ours existed, the owner could free his slave, provided no statute prohibiting such manumission existed, by simply discharging him from service and saying " *go, you are free.*" This doctrine has been partially recognized in various states of the Union, by ruling that in the absence of statutes prohibiting manumission, only the fact which amounts to proof of an actual discharge from service, with an expressed determination, either parol or written, of no intention to revoke such discharge, will amount to emancipation. Taking these principles as our guide, in the absence of proof of any law, custom or usage of the Chickasaws forbidding the emancipation of a slave, if the deed presented be fully proved, and by the jury believed to be good, genuine and authentic, the plaintiffs are entitled to their freedom. The court also charged that it was incumbent upon the defendant to prove that it was

against some law or usage of the Chickasaws for slaves to be freed, as plaintiffs claim to be, or the presumption arose that it was in accordance with such laws and customs.

The court also charged the jury "that where a witness swore to a fact as happening in 1821 or 1822, and better testimony was introduced to show that the fact did not happen until after 1823, it did not destroy the credibility of the witness as to other facts, the witness only being supposed to swear as to the time according to his best recollection and belief."

To the several charges so given, the appellant by his counsel in the court below excepted, and on the supposed error of the judge in giving them, he relies in this court for a reversal of the judgment rendered on the verdict of the jury in favor of the appellees.

To the first charge there can be no controversy. The United States have frequently acknowledged these Indians as an independent nation, to the extent accorded to such nations within the boundaries of the United States, and they have treated with them as such, under the treaty-making power contained in the constitution.

[348] To the second, there is believed to be as little doubt as to the correctness of the charge. The right of those Indian nations residing within the limits of a state to regulate their own civil policy has never been questioned, at least until the state authority has, by some affirmative act, claimed jurisdiction that would be incompatible with the existence of such rights, in the nation of Indians. Their laws and customs, regulating property, contracts, and the relations between husband and wife, have been respected when drawn into controversy in the courts of the state and of the United States.

The concluding part of the second charge was clearly not objectionable, because it must be borne in mind that the record does not show the shadow of evidence that any law of the description mentioned was offered on the trial as evidence to control the right of the Indians to govern themselves as to right of property. If such laws had been offered in evidence, it would have devolved on the court to have decided how far

the rights of parties were affected by them. The statutes of a state cannot be judicially known to the courts of another state; they must be proven as other foreign laws. The court can only judicially know the acts of congress and public treaties.

In the third charge, the judge prefaces it with his reasons for believing the charge about to be given is correct. It has nothing to do with the charge given, even if not sound. It only shows the process by which the mind of the judge is brought to the conclusion; and if that conclusion is right, it is not material whether the judge's process of reasoning be so or not, but in this instance we believe that he has not only reasoned well, from legitimate premises, but that his conclusion is also right. The conclusion is: "*That in the absence of proof of any law, custom or usage of the Chickasaws, forbidding the emancipation of a slave, if the deed presented be fully proved, and by the jury believed to be good, genuine and authentic, the plaintiffs are entitled to their freedom.*"

[349] We believe the right of property connects with it the right of relinquishing that property. If the right of property was in James Gunn, the former owner of the appellee, Laney, the presumption is that there was also a right to dissolve the relation of master and slave. This presumption could only be rebutted by proof of some municipal regulation in restraint of such right. The appellees, on making proof of the relation of master and slave, subsisting between Lucy and James Gunn, and then proof by the writing of manumission, make out at least a *prima facie* case that would, by all rules of evidence, throw the *onus* of proving whatever might operate in restraint of those rights on the appellant.

The supreme court of the United States say that "as a general proposition, it would seem a little extraordinary to contend that the owner of property is not at liberty to renounce his right to it, either absolutely, or in any modified manner he may think proper. As between the owner and his slave, it would require the most explicit prohibition by law to restrain this right." 8 Pet. 220.

The fourth charge is embraced in the decision on the pre-

ceding one. The last charge is on the effect or the credibility of a witness, when he swears to a fact happening at a particular date, and better testimony was given showing that it was not true. One of the witnesses swore that Gunn died in 1821 or 1822. It was shown by the will of Gunn that it was after 1823. The rule of evidence is never to presume a witness guilty of perjury if a more charitable construction can be put on his oath. The witness is, in the language of the judge in the court below, " presumed to swear to the best of his belief," and where he swears that an event occurred at a particular date and it should turn out that he is mistaken, not in the event but in the date of its occurrence, it would be an exceedingly rigorous rule that would hold such witness perjured. Then there was no error in the court charging the jury that it did not destroy the credit of the [350] witness who swore to the time when Gunn died, that it afterwards turned out that he did not die until after 1823.

To prevent misconception we will again advert to that part of the second charge of the court, as to the laws of Georgia, Mississippi territory or state, or the state of Texas. So far as the charge of the court refers to the state of Texas, it must be understood as applicable to the time when the rights of the parties accrued, and as they accrued in favor of Laney, in the Chickasaw nation in 1814, the laws of Texas did not govern the rights of emancipation in the master.

In that view, there can be no doubt the charge of the court was correct, and it was doubtless so intended to be understood, and not to extend to laws regulating remedies. We are fully satisfied that there was no error in any one of the several charges of the court to the jury. On the facts of the case as presented by the record the verdict of the jury is well sustained, and there can be no ground for setting aside the judgment. It is therefore affirmed.