LUCY ORTLEY, APPELLEE, V. JOHN ROSS ET AL., APPELLANTS.

FILED FEBRUARY 8, 1907.    No. 14,656.

Indians: MARRIAGE: VALIDITY. Marriages valid under the customs of an Indian tribe, which were performed among members thereof while the tribal relation existed, will be considered valid in the courts of this state, and children of such marriages will be regarded as legitimate.

APPEAL from the district court for Knox county: JOHN F. BOYD, JUDGE. *Affirmed.*

*John R. Hays* and *Isaac Powers,* for appellants.

*W. A. Meserve, contra.*

OLDHAM, C.

This was an action instituted by the plaintiff in the district court for Knox county, Nebraska, for the purpose of quieting her title to an undivided one-half interest in a tract of land situated in that county, and for a partition of the land among the heirs of Daniel Paypay, deceased. Daniel Paypay was a Santee Sioux Indian, who had taken

the land in controversy as an allotment, under the provisions of the treaty entered into with the Santee Sioux tribe by the United States on February 24, 1869, by which the United States agreed to give a patent to any male Indian of that tribe for 160 acres of land under the conditions named in the treaty. By the provisions of this treaty, any Indian receiving a patent under it became a citizen of the United States. Prior to the receipt of the patent in 1884 Paypay had been a member of the tribe of Santee Sioux Indians, and not a citizen of the United States. After the receipt of the patent he appears to have remained on his allotted lands in Knox county, and died there intestate in 1889. The main question at issue in this suit was as to who were his legal surviving heirs at the time of his death. The petition alleged that plaintiff and Sarah Ross, mother of the defendants, were the sole surviving legal heirs at the death of the ancestor, and that Sarah Ross had departed this life intestate on the 14th day of May, 1903, leaving the defendants named in the petition as her heirs at law. The answer denied the heirship of the plaintiff, and alleged that the defendants, heirs of Sarah Ross, were entitled to the entire estate. There was a judgment for the plaintiff in the court below and to reverse this judgment defendants have appealed to this court.

It is urged against the decree by appellants that there was a misjoinder of causes of action in plaintiff's petition, in that no partition of lands could be awarded until the title of the plaintiff therein had been established, and, as the title was in dispute, partition would not lie. This is an objection first interposed in this court, and which, as far as the record shows, was not called to the attention of the trial court. No motion was filed or demurrer interposed against the petition for misjoiner, but, on the contrary, an answer was filed which put in issue plaintiff's claim of heirship in the property in dispute. It appears from the record that the trial court first determined the question of heirship in favor of the plaintiff, and quieted her title

to an undivided one-half interest in the premises, and, having done so, proceeded to a decree of partition of the lands in conformity with the judgment quieting the title thereto. The court, being possessed of the cause and having all the parties in interest before it for the purpose of quieting the title in the lands, might, unless opportune objections were interposed, proceed to do full equity in the cause by awarding a decree of partition in conformity with the judgment.

This brings us to the real question at issue, which is as to the sufficiency of the proof of plaintiff's heirship. It is apparent from what has been said that each of the parties claim as heirs of Daniel Paypay. Defendants' claim of heirship is admitted, and the plaintiff's claim is in dispute. Plaintiff's claim is based on an alleged marriage, according to the custom of the Indian tribe, between Daniel Paypay and a squaw called Quadan, said to have been celebrated at Redwood, Minnesota, in the year 1869, the allegation being that plaintiff was the issue of this marriage. The evidence shows that the laws and customs of the Santee Sioux Indians place slight restrictions on matrimonial alliances between members of the tribe; that polygamy was practiced with impunity; that the only ceremony requisite was a mutual agreement between the parties to live together as husband and wife, and that this relation might be dissolved by mutual consent at any time, leaving the parties free to marry again at their pleasure. It appears that both Paypay and Quadan were members of the tribe at the time of their marriage, and both had been married under this custom one or more times before they united with each other. But the testimony all shows that, by the rules and customs of the tribe, they were recognized by all the members thereof as husband and wife during the year or more that they lived and cohabited together as such. While there is some conflict in the testimony as to the date of the marriage and the year that they lived together, all of the witnesses connect the time with plaintiff's birth, which,

they all say, occurred shortly after Paypay had repudiated the union and come back from Redwood, Minnesota, to the reservation in Nebraska. There is also evidence in the record showing that Paypay recognized plaintiff as his daughter during his lifetime.

Now, it is contended by appellants that, as the alleged marriage between the father and mother of the plaintiff was polygamous, it was neither valid in the state of Minnesota, where the parties then resided, nor in the state of Nebraska, to which they subsequently removed. This contention would be well founded if this marriage had taken place between citizens of the United States in any state of the Union. But a different rule prevails with reference to the marriages of Indians, who are members of a tribe recognized and treated with as such by the United States government; for it has always been the policy of the general government to permit the Indian tribes as such to regulate their own domestic affairs and to control the intercourse between the sexes by their own customs and usages. Consequently, when a member of an Indian tribe becomes a citizen of the United States and subject to its laws, by taking lands in severalty under the provisions of a treaty, as in the case at bar, a liberal rule is applied in determining the legitimacy of any offspring that he may have begotten under the customs and usages of the tribe to which he formerly belonged. The rule so applied is that marriages valid by the law governing both parties when made must be treated as valid everywhere. *Kobogum v. Jackson Iron Co.*, 76 Mich. 498, and cases there cited. The question of the legitimacy of offspring of a marriage of members of this same tribe in Minnesota, under very similar circumstances to those in the case at bar, was before the supreme court of that state in the case of *Earl v. Godley*, 42 Minn. 361, and it was there said: "An Indian tribe within the state, recognized as such by the United States government, is to be considered as a separate community or people, capable of managing its own affairs, including the domestic relations; and those persons belong-

ing to the tribe who are recognized by the custom and laws of the tribe as married persons must be so treated by the courts, and the children of such marriages cannot be regarded as illegitimate."

We are therefore of opinion that the evidence is sufficient to support the judgment of the district court, and we recommend that it be affirmed.

By the Court: For the reasons given in the foregoing opinion, the judgment of the district court is

AFFIRMED.