[Civ. No. 7454. Third Dist. Jan. 13, 1948.]

Estate of DALIP SINGH BIR, Deceased. HARNAM KAUR et al., Appellants, v. FLORENCE E. BOYES, Respondent.

Atherton & Dozier for Appellants.

Foltz and Rendon for Respondent.

ADAMS, P. J.—Dalip Singh Bir, a native of India, died intestate in San Joaquin County on April 18, 1945, and respondent Florence Boyes was appointed and qualified as administratrix of his estate. On April 4, 1947, two women named Harnam Kaur and Jiwi, both residents of India, joined in a petition to determine heirship, alleging in their petition:

"That your petitioners were, at the time of the death of the deceased herein, the legally wedded wives of said deceased, having lawfully married said deceased in the Punjab over 50 years ago whilst all parties were domiciled in Punjab Province, British India, according to the law and manner of the Jat community, in which province and community said marriages are lawful and valid. As said widows of deceased, petitioners are entitled to distribution of his estate."

Their petition further alleged that the residue of the estate consists of approximately $1,450 in cash and that in India petitioners would be entitled to share equally in the estate.

The record before us contains the following stipulation signed by counsel for the respective parties:

"IT IS HEREBY STIPULATED between counsel for the petitioners and the Administratrix herein, that the Petition for Determination of Heirship of Harnam Kaur and Jiwi was presented to the court as a joint petition requesting solely a judgment of an undivided one-half interest to each petitioner as the legal widows of Dalip Singh Bir, and that the judgment rendered was based upon said petition as so amended in open court, and the findings of fact and conclusions of law heretofore rendered may be deemed the final judgment herein denying said petition."

The trial court found that decedent, while domiciled in the Punjab Province of India, there married and was possessed of two wives, the petitioners above named, and that petitioners were legal spouses of decedent under the laws of the Punjab Province of India; that thereafter decedent emigrated to the United States and established residence in California, and that the money belonging to his estate was community property; that neither of said marriages had been dissolved prior to decedent's death but that no satisfactory proof was introduced as to which of the marriages was first performed.

Upon these findings of fact the trial court concluded that under the laws of California and the public policy thereof, only the first wife of decedent can be recognized as his legal widow. It therefore entered an order continuing the matter awaiting proof as to which of the marriages was first performed and which of the two petitioners was the initial wife of decedent. From that order the two wives have appealed.

Appellants rely on the provisions of section 63 of the Civil Code which reads:

"All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted are valid in this state."

In The Conflict of Laws, by Beale (1935), volume 2, page 666, the text reads:

"The American courts both those of the United States and those of Canada, have been much more liberal than those of England in recognizing and giving effect to a polygamous marriage or to a marriage which permits free divorce. Thus

they have recognized a marriage of native tribes, and have given widows of polygamous marriages the legal rights of a widow. . . . Thus in a case decided in British Columbia it appeared that a Chinaman, domiciled in China, and legally having two wives under the law of China, died while temporarily in British Columbia, leaving property there. By his will he left the property to his two wives. The question was whether the succession duty should be that due on a gift to a wife. Held, that it should be: that, he being validly married by the law of his domicil, the validity of the marriage should be recognized in matters of succession.''

The Canadian case above referred to is *Yew* v. *Attorney General for British Columbia,* 1 Dominion Law Reports 1166, British Columbia Court of Appeal (1923) ; and in that case many cases on the subject are cited. The conclusion there reached was that the law of China controlled, and since that law permitted the decedent to have more than one wife, the wives had the civil status of wives in China and must be so recognized in Canada in all matters of succession to property in respect to movables.

In 48 Law Quarterly Review 341 (Oxford, 1932), will be found an exhaustive treatise on the subject in which both English and United States decisions are cited. There at page 348 it is said:

''It does not appear, therefore, that the reported decisions of the English Courts really afford any support for the view that polygamous marriages must in all cases be regarded as void in contemplation of English law and the issue as illegitimate. Such inferences as can be drawn from them are rather in the contrary sense. As, however, there is a singular absence of direct authority on the question in the English cases, the decisions of American Courts or of Courts in other parts of the British Empire would presumably in a matter of this kind have a considerable persuasive authority in so far as they are decisions of Courts applying a law which is either based on English law or which, like English law, does not allow of polygamy.''

Also at pages 350-358:

''There are a number of decisions of the United States Courts. In an early case in the Courts of North Carolina (*Williams* v. *Oates,* 27 North Carolina Rep. 375; 5 Iredale 535) Ruffin C. J. states: . . . (b) that if a Turk with two wives were to come to the United States 'we would not refuse to adminis-

ter to them the justice due to the relations contracted by them.' The view expressed upon point (b) by Ruffin C. J. is confirmed by the judgment in *Polydore* v. *Prince* (Beale's Cases on the Conflict of Laws, Vol. III, p. 2) where the following dictum occurs: 'If a Turkish or Hindue husband were travelling in this country with his wife, or temporarily resident here, we should, without hesitation, acknowledge the relation of husband and wife between them. . . .' These statements are, indeed, 'obiter dicta,' but there are also two decisions in which the wives of potentially polygamous Red Indian marriages have been recognized as acquiring the status of a wife, and as therefore being incapable (as married women) of instituting an action while the marriage subsisted (*Wall* v. *Williamson*, 8 Alabama 48, confirmed on appeal, 11 Alabama 826, and *Morgan* v. *McGhee* (1844) reported in 24 Tennessee Rep. 12 and in 5 Humphrey Rep.), and in each of these cases disapproval was *expressed of the view that polygamous marriages could not be recognized at all,* while in a third case of 1860 (*Johnson* v. *Johnson's Administrator,* 30 Missouri Rep. 72 [77 Am.Dec. 598]) the issue of a potentially polygamous Indian marriage were held to be legitimate *for the purpose of succession.*

"These five American cases (and I have been unable to find any decisions in a contrary sense) therefore strongly support the view that it is not correct to say that English law can in no case recognize polygamous marriages as valid, or the issue thereof as legitimate. . . .

"It is now possible to begin the examination of the principles to be applied to determine the cases in which polygamous marriages can and cannot be recognized in English law, so as to confer on the 'wives' the status of a wife, for the purposes of section 10 of the British Nationality and Status of Aliens Act *or for the purposes of succession,* and upon the children the status of legitimacy.

"The general principles of Private International Law applied by the English Courts to determine the validity of marriages in general are (as stated in Dicey, Conflict of Laws —passage quoted on p. 4 above) that the marriage is valid if, and is not valid unless,

"(i) the parties possessed the capacity to marry each other according to the law of their domicil; (ii) and the marriage was a valid one under the *lex loci contractus.*" (Italics added.)

Polygamous marriages among Indians have been held valid,

and in *Rogers* v. *Cordingley*, 212 Minn. 546 [4 N.W.2d 627, 629], the court said:

"*Hallowell* v. *Commons*, 8 Cir., 210 F. 793, recognizes even polygamous marriages contracted by Indians according to their laws, and cites with approval from *Ortley* v. *Ross*, 78 Neb. 339, 110 N.W. 982, 983: 'Now, it is contended by appellants that, as the alleged marriage between the father and mother of the plaintiff was polygamous, it was neither valid in the state of Minnesota, where the parties then resided, nor in the state of Nebraska to which they subsequently removed. This contention would be well founded if this marriage had taken place between citizens of the United States in any state of the Union. But a different rule prevails with reference to the marriages of Indians, who are members of a tribe recognized and treated with as such by the United States government; for it has always been the policy of the general government to permit the Indian tribes as such to regulate their own domestic affairs, and to control the intercourse between the sexes by their own customs and usages.' "

To the same effect are numerous cases cited in the Rogers case. (See, also, 38 C.J., p. 1278.) Since polygamous marriages between tribal Indians are given validity for purposes of succession, it would seem there is no reason why the polygamous marriages in the instant case should not be held valid for succession purposes.

A good illustration will be found in illustration 1 to section 134 of Restatement of the Law, Conflict of Laws, at page 202:

"A, domiciled in state X, validly marries B and C in X. By the law of Y, a polygamous marriage is void. A brings B and C to state Y; *Y may refuse to permit him to cohabit with them.* A and B die; Y may grant a widow's allowance to C." (Italics added.)

Succession of *Caballero* v. *The Executor et al.*, 24 Louisiana Annual Reports 573, was a case where deceased, Caballero, lived with a negro woman in Louisiana and had several children by her. Prior to his death he married the negro woman in Havana, Cuba, where marriages between whites and negroes are valid, and thus legitimated the children. From Cuba he moved with his family to Spain where his children remained. Upon Caballero's death a dispute arose as to inheritance, the executor of decedent's will claiming the children were illegitimate since Louisiana declared all marriages between whites and negroes to be void. The court held in favor

of a child claimant as to her right to succeed to her father's estate on the theory that the marriage in Havana, Cuba, was valid in Louisiana insofar as the right to succeed to decedent's property was concerned. The court said:

"We understand the rule to be well settled that marriages valid by the laws of the country where they are entered into, are held valid in any other country to which the parties may remove, unless there exists, from reasons of public policy, in the country to which they remove, some impediment by the laws of that country, or that such marriages are in derogation of good morals. In such exceptional cases comity could not be invoked to recognize their validity. How stands the matter in regard to the rights of Mrs. Conte, the plaintiff in this case? Here we may notice that this person, after her parents removed from Louisiana to Spain, never returned to Louisiana to live, and that she is a subject of the government of Spain. At the time of her legitimation by the marriage of her parents, marriage between white persons and free persons of color was prohibited by our law. The Louisiana law would not have recognized as valid in Louisiana the marriage of Caballero in Havana. . . . Thus far would our law have extended and had effect when Caballero returned to Louisiana, but no further. Its edict, so far as it bore upon his marriage, was of local and limited effect. It existed for a purpose local and special in this country. That purpose could not have been more effectually carried out by withholding from persons abroad, legitimate by the laws of the country where they lived, *the right of inheriting property* in this State. . . . The policy of this State had no broader extent, because there was no reason why it should have." (Italics added.)

 The decision of the trial court was influenced by the rule of "public policy"; but that rule, it would seem, would apply only if decedent had attempted to cohabit with his two wives in California. Where only the question of descent of property is involved, "public policy" is not affected. It was so held in the *Succession of Caballero, supra*. On the authority of Beale on Conflict of Laws, *Yew* v. *Attorney General of British Columbia* and *Succession of Caballero, supra*, the two wives of decedent should share equally in the money in question. No case has been found that is opposed to those authorities. True, there are cases holding invalid polygamous marriages entered into in places where such marriages are legal, but in each such case found, all the parties were living

and no question of succession to property was considered. Therefore, it would seem that the above cited authorities which actually considered the right of succession and granted such succession in cases growing out of marriages legal where entered into but illegal in the place where probate proceedings are being had, are controlling. ██ ''Public policy'' would not be affected by dividing the money equally between the two wives, particularly since there is no contest between them and they are the only interested parties.

The order appealed from is therefore reversed with directions to the trial court to enter a decree in accordance with the views herein expressed.

Peek, J., and Thompson, J., concurred.