## Lenherr Estate.

Argued September 27, 1973. Before JONES, C. J., EAGEN, O'BRIEN, POMEROY, NIX and MANDERINO, JJ.

*Joseph M. Ludwig,* with him *Ludwig & Wilson,* for appellant.

*Donetta W. Ambrose,* Assistant Attorney General, with her *Israel Packel,* Attorney General, for appellees.

OPINION BY MR. JUSTICE NIX, January 24, 1974:

The sole issue involved in this appeal is whether or not the West Virginia marriage of Sarah T. Lenherr to Leo A. Lenherr, the decedent, will be recognized in this Commonwealth for purposes of the marital exemp-

tion to the Transfer Inheritance Tax. See, Act of June 15, 1961, P. L. 373, Art. III, §311, 72 P.S. §2485-311. If their marriage is so recognized, property held in their joint names will pass from the decedent to Sarah Lenherr without the imposition of a Pennsylvania inheritance tax. The Commonwealth contends that the property should be taxed at the rate applicable to transfers to collateral heirs, see, Act of June 15, 1961, P. L. 373, Art. IV, §404, 72 P.S. §2485-404, and it therefore claims a tax of $6,960.21 or fifteen percent of jointly owned securities in the net amount of $46,401.40. Diane L. Majoras as executrix of the estate of Leo Lenherr appealed the denial of the marital exemption to the Orphans' Court Division of the Court of Common Pleas of Allegheny County. After a hearing, the exemption was denied and exceptions argued before the Orphans' Court en banc were dismissed. This appeal follows.

The pertinent facts are as follows. On October 23, 1930, the deceased, Leo A. Lenherr was divorced on the grounds of adultery from his then wife Anna Kelly Lenherr and Sarah Barney [Lenherr] was named as the corespondent. On December 27, 1930, Sarah was divorced from her then husband William K. Barney on the grounds of adultery and Leo Lenherr was named as corespondent.

On March 12, 1932, after the two divorce decrees were entered and while William Barney and Anna Lenherr were living, Leo Lenherr and Sarah Gillespie Barney were married in West Virginia. They returned to Pennsylvania where they lived as husband and wife until the death of Leo Lenherr in August of 1971.

At the outset, it should be noted that all parties agree that Leo and Sarah's marriage was valid under the applicable laws of West Virginia. This dispute arises because of the Act of June 17, 1971, P. L. 174, §1, *amending*, Act of March 13, 1815, P. L. 150, §9, 48 P.S. §169 (Supp. 1973-74), which provides: "The hus-

band or wife, who shall have been guilty of the crime of adultery, shall not marry the person with whom the said crime was committed, during the life of the former wife or husband. . . ." See also, Act of August 22, 1953, P. L. 1344, §5, 48 P.S. §1-5(h) : "No license to marry shall be issued by any clerk of the orphans' court: . . . . To a person divorced by his or her former spouse on the grounds of adultery, for the marriage of such person to the person with whom the crime of adultery was committed, during the lifetime of the former husband or wife."

The Commonwealth argues that, by virtue of the above statutes, Leo and Sarah were under a personal disability not to marry each other while either former spouse yet lived,[1] and that Pennsylvania should not recognize their marriage for purposes of the marital exemption under the Transfer Inheritance Tax, supra, regardless of the status of that marriage in other jurisdictions.

We must determine first whether or not Pennsylvania law forbade the marriage of Leo and Sarah, for if it did not, then appellant must prevail regardless of whether we apply Pennsylvania or West Virginia Law. Section 169 prohibits the marital partner guilty of adultery from marrying his or her paramour during the lifetime of the former spouse. Section 1-5 is a companion provision which prohibits the issuance of a license for such a marriage. While Section 169 does not specify the nature of the judicial proceeding in which the adjudication of guilt is to be made, Section 1-5 specifies that no license shall be issued "to a person divorced . . . on the grounds of adultery. . . ." This

---

[1] Since William K. Barney was alive at the death of Leo Lenherr, this alleged disability to marry did not terminate in time to permit validation of the relationship on a theory of common law marriage. See, *Warrenberger v. Folsom,* 239 F. 2d 846 (3d Cir. 1956).

language leaves little doubt that an adjudication of adultery in a divorce proceeding is sufficient to trigger the prohibition of Sections 169 and 1-5, and we must dismiss appellant's contention that the legislature intended the prohibition to apply only to those found guilty of adultery in a criminal proceeding.[2] Moreover, Sarah's divorce decree specifically forbade her to marry Leo during her former husband's lifetime. We are therefore bound to conclude that, under Pennsylvania law, Sarah and Leo were forbidden to marry. See, *Stull's Estate*, 183 Pa. 625, 39 A. 16 (1898) ; *Maurer v. Maurer,* 163 Pa. Superior Ct. 264, 60 A. 2d 440 (1948).

Having concluded that the laws of Pennsylvania and West Virginia are in conflict with regard to the validity of this marriage, we must next determine which law should be applied in this case. In addressing choice-of-law problems, several competing principles come into play[3] and this Court has not been loath to reject rigid doctrines which fail to accommodate these principles. See, *Griffith v. United Air Lines,* 416 Pa. 1, 203 A. 2d 796 (1964).

Specifically regarding conflicts as to recognition of marital status, there is a strong policy favoring uniformity of result. In an age of widespread travel and ease of mobility, it would create inordinate confusion

---

[2] The only Pennsylvania case specifically deciding this issue has reached the same result. *Kalmbacher v. Kalmbacher,* 63 D. & C. 195, 202 (1945).

[3] The Restatement of the Law, Conflict of Laws 2d, §6 outlines those principles as follows: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

and defy the reasonable expectations of citizens whose marriage is valid in one state to hold that marriage invalid elsewhere. On the other hand, each state may, within constitutional limits, create laws and procedures concerning the sanctification of marriages, see, *Loughran v. Loughran,* 292 U.S. 216 (1934), and those laws and procedures should not be circumvented by the sham of travelling to a nearby less stringent jurisdiction.

The Restatement provides the following guidelines for resolving these conflicting principles:

"(1) The validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage under the principles stated in §6. [See n.2, supra.]

"(2) A marriage which satisfies the requirements of the state where the marriage was contracted will everywhere be recognized as valid unless it violates the strong public policy of another state which had the most significant relationship to the spouses and the marriage at the time of the marriage." Restatement 2d, supra, §283. Since both Leo and Sarah were residents of Pennsylvania before and after their West Virginia marriage, we have no trouble concluding that Pennsylvania has the most significant relationship to the spouses and the marriage. It remains for us to determine whether the policy behind section 169 is so strong that it must be given extraterritorial effect in this case, thereby destroying the uniformity of result which is so desirable in a case concerning the recognition of a marriage that is valid in the state where it was contracted.

In resolving that conflict, we must realize that the strength of the policy behind section 169 depends to a significant degree upon the incident of marriage under consideration. For example, the legislature has determined that at least one incident of marriage—the legiti-

macy of the children—is not to be denied despite the prior adjudication of adultery. See, Act of June 17, 1971, supra. Our task therefore is to balance on the one hand the policy behind section 169, *as it relates to the marital exemption to the inheritance tax,* against the need for uniformity and predictability of result on the other.[4]

It is apparent from the terms of section 169 that the provision is intended not so much as a penalty upon the parties who failed to recognize the sanctity of the former marriage vow as it is intended to protect the sensibilities of the injured spouse. Were it otherwise, the prohibition would not be limited to the lifetime of that spouse. Compare, *Newman v. Kimbrough,* 59 S.W. 1061, 1064 (Tenn. Ch. App. 1900). As we said in *Stull's Estate, supra,* 183 Pa. at 632: ". . . Now believing, as we do, that the statute in question, which we are called upon to construe in the case at bar, is expressive of a decided state policy not to permit the sensibilities of the injured and innocent husband or wife who has been driven by the adultery of his or her consort to the necessity of obtaining a divorce, to be wounded, or the public decency to be affronted, by being forced to witness the continued cohabitation of the adulterous pair, even under the guise of a subsequent marriage performed in another state for the purpose of evading our statute, and believing that the moral sense of the community is shocked and outraged by such an exhibition, we will not allow such parties to shield themselves behind a general rule of the law of marriage, the wisdom and perpetuity of which depends as much upon the judicious exceptions thereto as upon the inherent right of the rule itself'."

---

[4] Such an approach to conflicts is not novel. See, *In Re Dalip Singh Bir's Estate,* 188 P. 2d 499 (Cal. App. 1948), suggesting that a polygamous marriage was valid for purposes of succession regardless of whether it might be valid for purposes of cohabitation.

While that policy may yet be quite strong with respect to cohabitation and many other incidents of marriage, as noted above, we are concerned here only with the marital exemption to the inheritance tax. We are not convinced that the denial of that exemption will foster the policy of section 169 to any significant extent. Such denial could do so only if it: (1) could deter either the adulterous conduct during the valid marriage or the subsequent marriage of the guilty spouse and his or her paramour; or (2) could in any way spare the aggrieved former spouse the affront caused by such marriage.

We are convinced that denying the marital exemption would be all but fruitless in achieving the above goals. Moreover, we must balance any illusory gain from such denial against the need for uniformity of result in this area and against the statutory policy that the property of two persons living as man and wife and held in their joint names with right of survivorship is in reality the product of their joint efforts and should pass to the survivor without the imposition of a tax. Both of those policies would be frustrated by applying section 169 to this marriage. On balance, we find that the degree to which the policy behind section 169 will be fostered by application in this case is significantly outweighed by countervailing policies. We therefore decline to apply Pennsylvania law to invalidate this marriage for this purpose.

The decree of the Orphans' Court is reversed and the case is remanded for proceedings consistent with this opinion.

Mr. Justice MANDERINO concurs in the result.

Mr. Justice EAGEN and Mr. Justice POMEROY dissent.

Mr. Justice ROBERTS took no part in the consideration or decision of this case.